The People *v.* Lake.

---

DUTCHESS OYER AND TERMINER, May, 1855. Before *Dean* Justice of the Supreme Court and the County Justices.

THE PEOPLE *vs.* GEORGE LAKE ·

Rules and directions to govern a jury on trial of the question of present in-sanity, on an indictment for murder. (*a*)

The prisoner in this case had been tried and convicted of murder at the Dutchess Oyer and Terminer. The conviction was afterwards reversed by the Supreme Court, and a new trial awarded. (1 *Park. Cr. R.* 495.) When the public prosecutor moved on the cause for the second trial, the prisoner's' counsel alleged present insanity, and a jury was impanneled to try the question. Fifteen witnesses (physcians) were examined.

*M. & H. Hale,* for the prisoner

*T. C. Campbell,* (District Attorney,) for the people.

The following charge was given to the jury by the presiding judge.

*Gentlemen of the Jury*—The statute declares that " no insane person can be tried, sentenced to any punishment, or punished for any crime or offence, while he continues in that state."

(*a*) No insane person can be tried, sentenced to any punishment, or punis-ed for any crime or offence while he continues in that state. (2 *R. S.* 697, *Freeman* v. *The People,* 4 *Denio, R.* 9.)

The People *v.* Lake.

The prisoner stands indicted for the highest offence known to the law, murder, and that, too, committed upon his own wife and offspring. He has been once tried and convicted on this charge, and a new trial granted him, not because the court believed him insane, but wholly on the ground of error arising on the admission and rejection of improper testimony. The new trial was set down for this time, the public prosecutor moved it on, the prisoner's counsel alleged his insanity, and the court deemed it proper to try that question first and distinct from his crime. It is for this purpose, to determine whether he is now insane, that you are impanneled. You will not allow the atrocity of the offence, nor the supposed effect of your verdict, either on the prisoner or the community, to influence you in the least, but, unswayed by prejudice and unbiased by feeling, you will pass upon the question of his present sanity; if you find that he is sane, we shall then proceed to try him on the indictment; if, on the contrary, you find him insane, the humanity of the law interposes for the protection of his life until he is restored to reason. In the mean time, he will be kept in close confinement, and society protected from his fury.

Before proceeding to call your attention to the law as applicable to this case, I will make a passing remark on the strange objection that has been made by one of the counsel in reference to the propriety of the request made by the court for physicians to examine the prisoner, so as to be able to testify as to his state of mind. The court did not do this; I did it, and assume its full responsibility. And I only allude to the subject on the prisoner's account, lest you might not, if you supposed there was any thing improper in the selection of these men, give to their testimony the weight it would otherwise have. The defence on the former trial had been insanity, respectable physicians had then testified that he was insane, others, that he was not. The alleged insanity continued and physicians it was said, would not make an examination. Knowing that the object of a trial was to elicit truth, and that truth could only be obtained by knowledge, and that knowledge was acquired by investigation, that you might have some evidence,

The People *v.* Lake.

some rational opinions, founded upon sufficient facts, I made the request for four medical men to make an examination satisfactory to themselves. The four physicians were of my own selection, one of them, Dr. John Cooper, Sen., had, on the former trial, given his opinion that he was sane, another, Dr. Varick, had on that trial testified that in his opinion he was insane, while the other two, Doctors Hughson and Bockee, had never seen him, and were consequently uncommitted. I need not tell you, gentlemen, what is the professional standing of these four men among their brethren in this county or in the community. If the object of this trial is, however, to go into the matter blindfold, rather than to elicit truth, then it is very improper to have any body examine him enough to form an opinion. It has been said that this looks like an attempt of the court to have the man found insane. Is it possible that the district attorney will make such an admission, that an investigation by competent physicians must lead to a verdict of insanity? You should not take it as such, and I hope you will not allow even his mistakes to prejudice the rights of the people on the one side, nor any thing that the court may do, to affect the prisoner. You are not trying the court or any of its officers, but the sanity of the prisoner. Whenever any issue is made against me, I shall be glad to meet it here or elsewhere. If the public, or any one who represents it, desires to see any one hung with-out an opportunity to know whether he is in a proper state of mind to be tried, or a fit subject of punishment, they must not ask me to assist at the execution.

To return to the question to be tried, is the prisoner now insane? To determine this, it will probably be unnecessary to give you a definition of insanity; it is a condition of mental existence which is known and recognized in the laws of all civilized states, and which exempts the person subject to it from punishment. Its symptoms or outward manifestations, are well known by those who have devoted their time and attention to its study

Insanity is as various in its phases and effects as the persons

in whom it appears, yet there are four general classes into which, for convenience it is divided.

1. *Mania,* where the hallucination or delusion is general, extending to all objects.

2. *Monomania,* in which the hallucination is confined to a single object, a class of objects, or to a limited number of objects.

3. *Dementia,* or madness, where the person afflicted is rendered incapable of reasoning, in consequence of functional disorder of the brain, not congenital, or born with the person.

4. *Idiotism,* total want of the reasoning powers from malconformation of the organ of thought at the time of birth.

It is not pretended that the prisoner is an idiot, and has never been of sound mind; nor do I think it can be claimed that he is absolutely demented, or rendered incapable of reasoning upon all subjects; his lunacy, if it exists at all, is in the form of a mania or monomania, probably the latter.

Your position in a case of this kind is peculiar. In ordinary trials, you are to hear the testimony of witnesses as to the existence of certain facts, and on them find a verdict. Here you are to form an *opinion, on the evidence of opinions.* This results from the nature of the subject of inquiry, the mind, an existence which is invisible, imponderable, intangible, and immeasureable. The minutest filament of matter, the air itself, can be weighed, but there are no scales in which the mind can be balanced.

If the title to land is in dispute the deeds and conveyances, the surveyor's compass and chain can determine the question. So of almost any action or prosecution, the facts as detailed by the witnesses will enable a jury to determine the question at issue. But here the point in dispute is the existence or non existence of a certain mental state. It is not even the *amount* but the *soundness* of mind.

Ordinary persons, no matter how intelligent, can not give an opinion, but any man who has acquired, as an addition to his name, the letters M D., be he ever so ignorant, can give you his opinion.

The People *v.* Lake.

Another question arises, are you to base your verdict upon the opinion of medical men or your own?

On this subject, the whole theory of jury trials, and the reason of the case, satisfy me that it is *your* opinion, and not that of the doctors, which is to make up the verdict.

How much reliance you should place on the opinion of a medical witness, depends upon his skill, his means of judging of the true mental condition of the prisoner, and the facts he details to you as the basis of that opinion.

Mathematics, chemistry, philosophy and surgery are sciences, but medicine, unfortunately, can not be ranked among them. Between Allopathy and Homœopathy, and the various other systems, every nostrum and every humbug has its practitioners and its victims, but there are nevertheless among those who pursue this profession scientific men, whose opinions on mental or physical diseases are entitled to consideration. There are certain things which are settled, the state of the pulse and skin in fever; the effects of certain articles, used medicinally, on the human system; so there are certain phenomena, which when they exist, are admitted to be symptoms of insanity. Among these are wakefulness, want of appetite, or the reverse, an excited pulse with cold extremities during the absence of any inflammation, heat of the head, melancholy, an expression of the eye, hard to describe, but which, while it shows intellectual dullness, exhibits a stare or wildness easily discernible by those acquainted with insanity, alternate laughter and weeping, without any perceptible or sufficient cause, a suspicion of friends. These symptoms, even with those known to be insane, are rarely if ever all present in the same person, but the existence of any number of them, accompanied by incoherent conversation and unusual conduct, ordinarily prove the patient insane.

Do these symptoms, or any of them, exist in the case of the prisoner? The sheriff has testified in reference to his wakefulness; that he had watched him, and never found him sleeping, and never but once when he seemed to have been sleeping. Houghtaling has given evidence in reference to his want of sleep the night following the murder. The only proof we have

as to the pulse shows that it is accelerated or faster than in a person of his age in ordinary health. It is shown that he has been known to laugh and weep alternately, and without any apparent cause. That he is and has been, ever since the homicide, suspicious of his friends, and that he refuses to confide in or consult with his counsel. It is also in evidence that just before the homicide he was seen while in the public highway to stop his horse, take him by the head, lead him around in a circle, then drive a few rods, and repeat the same thing; that he was seen sitting on the top of the bureau in his house, with his feet in the drawer, laughing, crying, talking incoherently, and striking his head against the wall. These symptoms and actions are all consistent with insanity. I do not say that they are controlling, but should be carefully weighed and considered by you in deciding this question.

Every one who has heard the evidence, and observed the conduct of the prisoner during this trial, will agree that this is a case either of simulated or real insanity. Which is it? In determining this, you should take into view his circumstances in life; the opportunity he has had for learning the real symptoms of insanity. If he were a physician and had committed crime, it would be far easier for him, knowing the symptoms, to imitate them. The only evidence we have as to his situation is that he has lived in the interior of the country, that his circumstances are very humble, and that he can not write even his name. The probabilities are, therefore, that he has little if any learning of books, and consequently, if he feigned, does it without knowing the precise symptoms necessary to accomplish his object.

There was a fact stated by Dr. Upton, which in my mind weighed very strongly in favor of the reality of his madness. You will remember that we yesterday took a recess of the court to allow the physicians subpenaed against the prisoner to examine him. This examination was conducted by Dr. Upton, who asked the prisoner why he traveled so much in the night, just before the homicide. To this he replied that he could get no rest at home, and in describing the methods resorted to, to

obtain rest, said he was in the habit of going down stairs and leaning against the bags of oats to sleep, instead of sleeping in a bed. Beck, in his Medical Jurisprudence, quoting from Hasam, says: "The symptoms are aggravated by being placed in a recumbent position; and patients, when in the raving state, seem, of themselves, to avoid the horizontal position as much as possible, and when so confined that they can not be erect, will keep themselves seated. This remark applies equally to mania and monomania " If Lake, prior to the murder, could not sleep nights, could find no rest, went instinctively to a place where he could lean against the bags of oats, instead of lying down upon a bed to sleep—here is a very strong evidence of insanity. It is scarcely possible that he yesterday, when stating this fact to the physicians, knew its effect as evidence, for it seemed to attract no attention from them, and had not been alluded to by counsel; but to my mind it is a most controlling circumstance in the case, and irreconcilable with the theory of simulated insanity. Again, we find that yesterday, when the court adjourned, it was announced in the prisoner's presence that the object was to allow physicians to make a personal examination, and testify in reference to him. They did make that examination; then, if ever, he would have feigned insanity, or would have refused to answer. But, on the contrary, he answered every question, was accurate in dates, and exhibited no aberration of mind until he was asked in reference to the homicide, and as to that said if his " wife was black, then it was all right; if not then he was accountable," and as a reason for killing his children, that, " when the body went down to the ground it needed neither food nor raiment." This to me resembles delusion far more than simulation.

Again, wakefulness can not be feigned for any continued length of time. Dr. Beck says: " Pretenders are unable to prevent sleep. That wakefulness which is so constant an attendant on the insane, is scarcely to be preserved for any length of time by those who are in actual health." He then cites the case of a seaman, who to escape punishment, enacted the part of a furious maniac; sound sleep overpowered him on the second night of

attempt. This must be so; for sleep is not a voluntary state. No man, by his mere volition, can put himself to sleep, nor can the strongest will, unaccompanied by mental and physical ex citement, prevent it. Both body and mind require it, and ı comes unbidden.

The counsel for the prisoner insists that the homicide itself proves the insanity of the perpetrator. To hold this sufficient evidence to establish insanity would be dangerous; but it is proper to examine the act with all its attendant circumstances, and see whether it is most consistent with real or pretended insanity; see if you could discover a motive, or a sufficient motive; whether these victims stood in his way, whether there was any jealousy of his wife. And in doing this, you are to regard the prisoner as a human being, possessed of moral, intellectual and physical faculties swayed by passions and actuated by affections. But you will not allow the atrocity of the act alone to satisfy you of the insanity of the perpetrator.

I regret that you have not had more aid from professional men of sufficient skill to determine the prisoner's actual condition. The same author from whom I have before quoted, says: " Madness is most commonly feigned for the purpose of escaping the punishment due to crime, and the responsibility of the medical examiner is consequently great. It is his duty, and should be his privilege, to spend several days in the examination of a lunatic, before he pronounces a decided opinion." This has been neglected in this case, though the prisoner has for nearly two years occupied a cell in your jail. But you are now, on all the evidence that has been produced, to find a verdict. In coming to a conclusion, you will remember that every man is presumed sane, and responsible for his acts, until the contrary is proved, and therefore that the affirmative of the issue is with the prisoner. If the evidence satisfies you that he is insane, so that he can not make a rational defence to the indictment, you will say so, and he will then be placed where he will be treated for his disease, and if restored to sanity, will be tried for the offence. If, on the contrary, the evidence fails

to satisfy that he is insane, you will pronounce him sane, and we will then proceed to his trial for the crime.

You will not fail to remember during your deliberations that it is *you* who are to settle this question, and not the court; that if any intimation of an opinion has inadvertently escaped, that you will only regard it in as far as it was supported by satisfactory reasons. The prisoner, if insane, is most unfortunate in having been so long confined, and treated merely as a criminal; if he is not insane, he is still more unfortunate in being the perpetrator of a murder which in its atrocity is scarcely paralleled in the dark annals of crime.

The jury found the prisoner insane.